AMERICAN BEAD CO. *v.* UNITED STATES (No. 1341).[1]

WHERE TWO OR MORE RATES OF DUTY ARE APPLICABLE.

The present merchandise before and at the time of the passage of the tariff act of 1909 was known commercially as beads and known also commercially as agate button blanks, and under the testimony it can not be well said that either designation is the more specific. Accordingly, the articles fall within the final clause of paragraph 481 of the act in question, by which they must take the higher rate of duty assessed upon the two classifications.

United States Court of Customs Appeals, December 14, 1914.

APPEAL from Board of United States General Appraisers, Abstract 34844 (T. D. 34201).

[Affirmed.]

*Allan R. Brown* for appellant.

*Bert Hanson,* Assistant Attorney General (*Charles D. Lawrence,* special attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise consists of small rounded disks of commercial agate, white in color, and pierced with a single hole through the center. They were invoiced by the importers as agate beads.

The appraiser reported the articles to be parts of agate buttons, and returned the same for duty as such under paragraph 427 of the tariff act of 1909. They were accordingly assessed with duty under that paragraph.

The importers protested against the assessment, contending that the merchandise was beads and therefore dutiable under the *eo nomine* provision for beads of all kinds contained in paragraph 421 of the same act.

This issue was tried upon evidence before the Board of General Appraisers and the board overruled the protest. The importers now prosecute their appeal from that decision.

The following is a copy of the pertinent parts of the two paragraphs thus relied upon by the respective parties:

421. Beads and spangles of all kinds, including imitation pearl beads, not threaded or strung, or strung loosely on thread for facility in transportation only, thirty-five per centum ad valorem; * * *.

427. Buttons or parts of buttons and button molds or blanks, finished or unfinished, shall pay duty at the following rates, the line-button measure being one-fortieth of one inch, namely: Buttons known commercially as agate buttons, * * * one-twelfth of one cent per line per gross; * * * and in addition thereto, on all the foregoing articles in this paragraph, fifteen per centum ad valorem; * * *.

The issue therefore is whether the importations were dutiable as beads under paragraph 421 or as parts of agate buttons under paragraph 427, both above copied.

It convincingly appears from the testimony that the present articles are simply certain sizes of similar articles made in many differ-

---

[1] Reported in T. D. 35001 (27 Treas. Dec., 656).

ent sizes, all of which had been the subjects of importations into this country for more than 30 years next preceding the tariff revision of 1909. During all but the last few years of that period the merchandise figured exclusively in the bead trade, being imported by bead houses only and being known commercially as agate beads. In use the articles were strung upon ornamental strands, either alone or together with beads of other colors and materials. Such strands were cheap in character, generally selling for 5 or 10 cents apiece in the retail trade.

A few years prior to the tariff revision of 1909 a new use was found for the articles, which speedily became their chief use. By chance it was observed by a button manufacturer that in point of size and form these articles resembled certain button blanks made of pearl, ivory, glass, or other materials, and used as bodies in the manufacture of shanked buttons. Such button blanks were rounded disks like these with single perforations, through which metal shanks could be twisted by machinery, thus converting them into completed buttons. Upon experiment it was found that the present articles were susceptible of the same use by means of the same machinery, thus affording a cheap and suitable body for the manufacture of such buttons. Nor did this appear to be an abnormal or irregular use of the articles in question, for they were exactly suitable therefor in point of size, shape, material, and cost of production. And they were similar in size and shape to button blanks made of other substances for similar use in the manufacture of shanked buttons. Such buttons are largely used as shoe buttons. They are also sewed upon certain kinds of garments, and when made with agate bodies they are of course known commercially as agate buttons They are also made into sleeve and collar links, composed of two buttons held together by metal links.

The history of this development is told by the importers' witness, Harry S. Neumann, whose testimony upon that subject is here copied. The date of his examination as a witness was December 1, 1913. According to his statement the transactions of which he speaks began about seven years before that time, or about the close of 1906, being more than two years before the enactment of the tariff act of 1909.

Q. Are you familiar with the merchandise the subject of this hearing?—A. Yes, sir.

Q. You, I believe, testified that you bought these articles and used them largely in the manufacture of fancy buttons?—A. Yes, sir.

Q. How long is it since you first found that these articles were capable of being used by you in the manufacture of buttons?—A. I should say about seven years.

Q. At that time what was there—a machine developed, or what—that enabled you to make buttons out of these articles?—A. A demand sprang up for a shoe button. We were making them in pearl and we found them rather expensive. The trade wanted something cheaper. I happened to walk by the American Bead Co.'s window

on Broadway and saw agate beads in the window. I went into the American Bead Co., whom I had never known before, and asked to see some of those samples. They showed me samples. I took the beads and we went to the factory and took those beads and put them in the same machine that we have to make pearl buttons with a revolving shank on, and they worked satisfactorily.

Q. At that time that you devoted yourself to getting beads for this use, did you not notice at all what the finish on the one side was, whether they were equally finished on both sides, or whether one was rough?—A. One was always rough, because we put the rivets through the well finished side. In other words, the rough was the back.

Q. And these beads bought from the American Bead Co. were bought out of stock?— A. We bought samples out of stock. They only carried a limited quantity.

Q. Subsequent to your development of this use for the article, did you buy from other people? Did you see other people who were the manufacturers of these to see whether the demand for your raw material could be filled?—A. Yes; after buying from the American Bead Co. I went to Europe to one of the syndicates that makes these goods in Austria and I went to Germany and bought them from another manu facturer. We also bought them in France.

Q. How many manufacturers are there of these agate beads in the world that you know of?—A. To my knowledge there are five manufacturers.

Q. And have you bought these articles from all five of them?—A. Well, only four of them make this special class of goods, but we have bought them, I believe, of every one of them.

Q. Have you had samples submitted to you before purchase of their regular agate beads?—A. Well, we simply buy them according to the special sizes.

Q. Before buying, you see their product?—A. Yes, sir.

Q. Were those samples thus submitted finished on both sides or have they all this same defect of having one side finished and one rough side?—A. Always the same; always the same traces of being rough on one side.

Q. Do you know why that peculiarity of having one rough side and one finished side exists in the case of agate beads?—A. I can not tell you exactly why, because it is a secret process of these factories, but I have always noticed that to be the case in these agate beads.

Q. That has been the practice how long?—A. Ever since I have been handling the goods.

Q. For seven years?—A. For seven years.

Q. (By General Appraiser SULLIVAN.) Could they be used as beads or buttons, either one?—A. Of course we have used these things largely as buttons.

Q. (By General Appraiser McCLELLAND.) You have never been in the bead business?—A. No; simply for buttons.

Q. You have no idea of what is the most specific use, making beads or buttons?— A. Well, they make mostly beads of course, because all the other trades use a great number of these, but I am not in the bead business.

By Mr. LAWRENCE. Q. During the seven years you have handled these agate articles you have used them exclusively in the button trade?—A. Well, we have made various articles out of them, for collar bars and things like that [indicating].

Mr. STRAUSS. The court won't know what you are referring to.

The WITNESS. I will say we have used these things as buttons chiefly.

Q. That is the practical commercial use to which you have devoted them?—A. Yes, sir; the use to which we have devoted them absolutely.

\* \* \* \* \* \* \*

Q. What kind of a button do you make principally?—A. Well, shoe buttons; we make all these things into buttons.

Q. What are the buttons that you make used for most generally?—A. To-day they are used chiefly by us for these collar bars for soft collars. In other words we take two

of these buttons, and after we make them we put a metal link in between them. They are put in to hold the ends of the soft collar, but in three months from to-day our chief sale may be shoe buttons.

The following extracts from the testimony are given in further explanation of the facts:

### F. J. Appelbee:

Q. Based upon your experience is it not true that the merchandise represented by Exhibits 1 and 2 is used chiefly in the manufacture of buttons?—A. Well, at the present time they are used chiefly for the making of those collar links.

Q. Collar links such as you introduced exhibits for?—A. At the present time; yes.

Q. Prior to the present time what have they been used for?—A. For buttons.

Mr. STRAUSS. The collar links is illustrative Exhibit C.

Q. What was the chief use of them at and prior to August, 1909?—A. The chief use then was for buttons.

Q. What kind of buttons?—A. Shoe buttons.

Q. For ladies' shoes particularly?—A. Well, ladies' shoes.

Q. They are still being used for making shoe buttons, aren't they?—A. To some extent.

Q. Are they also used for making buttons for white linen coats, or white coats worn by barbers and others?—A. Yes.

### Hugo G. Veith:

Q. Please look at Exhibits 1 and 2 in this case, and tell me how long you have been familiar with merchandise of that character?—A. Over 30 years.

Q. At wholesale?—A. At wholesale.

Q. In the markets of this country?—A. Yes, sir.

Q. During all of that period that you have been familiar with them by what name have they been bought and sold in the markets of this country?—A. They have been imported and known in trade and commerce as beads.

Q. And has that been true during all the period that you have dealt in them?—A. Yes, sir.

Q. Have they been bought and sold as beads?—A. Yes, sir.

### Mortimer Hyman:

Q. When beads are used for bead necklaces or trimmings they are used in their naked condition as they appear here, aren't they?—A. Yes, sir.

Q. Then you spoke of their possibly being utilized for some other purpose?—A. Yes.

Q. For instance, what other purpose?—A. They make buttons out of them.

Q. When they make buttons out of them they entirely change the nature of the bead, don't they?—A. By putting a shank and turning it into a button, which can be done with almost any bead—any bead.

Q. These articles are commonly used for making buttons, are they not?—A. They are now; yes, sir.

Q. That is probably the greatest use for them at the present time?—A. Yes, sir.

Q. Has that been true for about five years?—A. I don't know whether it is that length of time; I don't think it is more than two or three years to my knowledge.

Q. Is there any doubt in your mind that that is the chief use of these articles to-day?—A. At the present time, yes, I think its chief use is buttons.

### Louis Rosenberg:

Q. State whether Exhibit 1 in question, samples that you have produced, were within or without the meaning of the term bead as used by your trade at the time stated?—A. Unquestionably beads.

Q. Has that always been true?—A. Yes, sir.

\* \* \* \* \* \* \*

Q. Are you familiar with the use of these articles to-day, having reference to the articles in dispute; these agate pieces?—A. Yes.

Q. Do you know what they are chiefly used for at the present time?—A. There are two sizes specially imported for buttons—two or three sizes.

Q. And this particular size is one of them?—A. Yes, sir.

Q. This Exhibit 1?—A. Yes, sir.

## Solomon B. Mendel:

Q. What is their chief use?—A. Exhibit 1 has been used almost exclusively for shoe buttons.

\* \* \* \* \* \* \*

Q. Now, will you please tell me what the wholesale trade and commerce of this country—not the manufacturers, but the buyers and sellers—call the button blank?—A. Partly finished button.

Q. Any partly finished button?—A. I think so.

Q. Any material that can be possibly used in a button is called a button blank?—A. I think so, used for button purposes.

Q. Anything used for button purposes?—A. Yes.

Q. Then your inclusion of Exhibits 1 and 2 is based upon the fact that you know it can be used for button purposes?—A. Exactly.

## Charles Blakeman:

Q. Having in mind, Mr. Blakeman, the trade meaning of the term "button blanks" at and prior to August, 1909, state whether its meaning would include merchandise like Exhibits 1 and 2.

Mr. Strauss. Objected to on the ground that it is incompetent, irrelevant, and immaterial, and the witness is not shown to be competent to answer, and sufficient foundation has not been laid. Objection overruled.

Mr. Strauss. Exception.

Last question read.

A. They have always been known as the same prior to 1909 as they would be up to to-day, ever since I can remember.

Q. Would they be included in the trade term "button blanks"?—A. Yes; they certainly would.

Q. Now, what is there, Mr. Blakeman, about the exhibits which enables you to identify them as button blanks?—A. Well, the shape and form, and everything else. If we manufacture a shoe button we have got to make it in that shape before we can put our shank in it, and consequently it is always known as a blank, and it is known until it is finished up.

\* \* \* \* \* \* \*

Q. Is it a usual thing for a pearl button blank to have the shape of Exhibits 1 and 2 before you?—A. Well, we have got to put it in that shape before we can sell it for a button.

Q. I am talking now not about the button, but the button blank that you have been saying you bought and in some measure have sold. It is not in the shape of Exhibits 1 and 2?—A. I have blanks exactly the same in pearl.

## C. H. Putnam:

Q. Confining yourself to the term "button blanks," was the meaning of that term definite, uniform, and general?—A. It is a uniform expression.

Q. (By General Appraiser McClelland.) What did it mean?—A. It meant a blank. It meant partly a button.

Q. Describe it.—A. Well, it is a partly finished button. In other words it has all the finishes, except just a touch. It might need a hole or a little brad or a little finish on the face. It may just need a little work to finish it as a button.

\* \* \* \* \* \* \*

Q. (By General Appraiser McClelland.) Having in mind the form and general appearance of Exhibits 1 and 2, regardless of the material from which they are made, would they, or would they not have been included within the term "button blanks" prior to August 5, 1909?

Mr. Strauss. I object to your honor's question.

Objection overruled.

Mr. Strauss. Exception.

The Witness. They would be included as button blanks.

While the testimony as a whole is not free from contradictions, it may nevertheless fairly be concluded therefrom that for several years prior to the revision of 1909 the present merchandise continued to be bought and sold by bead merchants and to be commercially known as beads in that branch of trade and commerce, but that nevertheless during the same period the chief use of the merchandise in this country was in the manufacture of agate buttons, and among merchants dealing in button supplies these articles were commercially known as agate button blanks. This condition also obtained at the time of the present importations.

It thus appears that the history of such importations naturally falls into two parts, and it may be noted that the procedure at the customhouse changed with the changing use of the article. For many years such articles were regularly classified as beads and were so assessed; but afterwards, under instructions, the appraisers returned the same as agate button blanks or parts and they were assessed as such. But during the entire period there were also continuous importations into this country of buttons which were made of the same material as these, but which were pierced with two or more eyes for use in sewing the same upon garments. It is conceded that such buttons were all the time commercially known as agate buttons and that they were always assessed as such under the *eo nomine* provision for agate buttons. The importers claim that the buttons just described are the only ones which were ever within the purview of the agate-button classification of the several tariff enactments, whereas the Government contends that the present articles should be classified as agate-button blanks since they are the finished bodies of which agate buttons of a certain kind are made.

According to the recitals above appearing it seems that the commercial designation of the present article is so divided as to be no longer general, uniform, and definite and that the article itself under the circumstances would actually and properly bear both names alike, being at the same time an agate bead and an agate-button blank. This being the case a question at once arises concerning the relative degrees of specificity of these competing classifications. A consid-

eration of this question leads to no satisfactory conclusion. It may be said with equal propriety that the articles in question are beads which form only a kind or species of button blanks, or that they are button blanks which form only a kind or species of beads. Either term may thus be accepted as the species of which the other thereupon becomes the genus, and upon the whole it can not be said rightfully that either designation is in fact more specific than the other. In this situation the merchandise seems to fall within the final clause of paragraph 481 of the tariff act of 1909, which reads as follows:

If two or more rates of duty shall be applicable to any imported article, it shall pay duty at the highest of such rates.

According to this rule the merchandise should bear the higher rate of duty imposed upon the two classifications within which it falls. Inasmuch as this result has been reached by the present assessment the decision of the board sustaining the same is *affirmed.*